Thank you and good morning everyone. We are ready to proceed in the matter of Munich Reinsurance v. American National Insurance Company. Mr. Mitalka? Yes, Your Honor. May it please the Court. My name is Andrew Mitalka. I represent American National Insurance Company and I would request that I reserve five minutes, Your Honor. Yes. This case involves legal standards that evolved in the time of three-masted clipper ships and where handshakes were contracts. It involved a law that started in Lloyds where people would just put their mark on slips and trusted that the information they were getting was truthful, accurate, and complete. That's because the people sitting in Lloyds, like the reinsurers today, do not go out and do inspections of the underlying risks and trust that the people ceding them the risk give them all the full and fair material information necessary. Isn't some of that law that you're also asking us to apply pre-Erie? And I assume in your opening comments that you're referring in part to Sun Mutual. I am, Your Honor. So what authority is there that New York has actually adopted Sun Mutual? Well, Your Honor, actually, I was going to get to it, but I would like the Court to look at a case that was not addressed in the brief, and it's called GEER v. Union Mutual Life Insurance Company. The site is 7 Northeast 125. It's a Court of Appeals case from New York in 1937. Most of the cases are in the 30s. I don't know what was happening in the 30s, but everybody would seem to be dealing with reinsurance cases. But Your Honor, the two things that I wanted to address to the Court is, first- You said you wanted us to consider that case. What is it? It's not in the briefs. Yeah, that case says- What is the relevance of it? The relevance of that case is the way that the test for materiality is applied. That case says that, obviously, the standard of utmost good faith applies in reinsurance contracts, and it says, quote, the question in such a case is not whether the insurance company might perhaps have decided to issue the policy, even if it had been apprised of the truth. The question is whether failure to state the truth, where there was a duty to speak, prevented the insurance company from exercising its choice of whether to accept or reject an application. How about the test being what the insurer determines to be material, and what the insurer determines to be material? The test, Your Honor, at least as I appreciate it, is that to define materiality, it has to be what the objective insured believes the insurer would find important. In this case- And also what the insurer- Objectively- In this case, though, we have- Find material. I'm sorry, Your Honor. Also what the insurer would- Deem material. Deem material. Right, and in this case, the insurer deemed all of the material that was withheld material because they studied it and thought it was important. So I don't think it's a question, this isn't like Christiana, where they didn't appreciate the information about the three wheelers and didn't know it, so couldn't tell someone. But part of the problem with your argument is, I guess you could say it's material to know. You know, Munich's carve-out, and that's what we're ending up with here, Munich ends up with 250 over 250, and your client ends up with the 500 over 500. Yes, Your Honor. What Munich's risk was on the workers' comp coverage, what they were going to cover, what were those losses that came in between 250 and 500? So what was material to them is different than what's material- could be different than what's material to your client. Your Honor, my response is, actually what Munich's contract was, is they had 750 excess of 250. That's what their contract with Everest was. Yes, but they also had a carve-out. And then they carved out. They had continental- continental had the carve-out before your client's. Correct. So they didn't have that. Right. I mean, their position is they were looking at what their risks were from the milepost 250 to 500. Could be markedly different. It could be, but if you- I would respond this way, Your Honor. The packet of information that was given to Munich for their position was the same packet of information given to American National for the carve-out. So it had to be the same information that everyone was looking at. And in this case, American National's underwriter at IOA-Re asked specifically for two things. One, they asked for what the Munich's rate was, which in fact had gone up 150 percent and they never were told. And they asked for audits or reviews. And they were only given one that was favorable, while Munich withheld several that weren't. And to the extent their expert got up and said, well, you didn't have a duty to tell somebody unless it was materially bad or wrong, they gave us one. But that one wasn't materially wrong. It was favorable. And so in this case, it's do we get to be on the same level playing field? And we submit to the court that we weren't. Was it that sufficient, though, the packet of information that Munich got from Everest to give to your underwriter? Wasn't that sufficient? And if you needed any additional information, could you not request it? Your Honor, we could. But the test is, did we have a duty to inquire or did they have a duty to speak? That's really what this court has to address. Because while the courts have said you don't have a duty to speak, in fact, Judge Wilson in a footnote said we didn't have a duty to inquire. She then kind of dinged us because we didn't ask twice for some information we didn't get. Asking Judge Point's question in another way, what we're really talking about is the duty of utmost good faith. Correct. And that, as it's stated in its terms and has been explained, relates to having the same information about the original risk of loss, which is consistent with what Ms. Hoekstra repeatedly said about looking at Everest's loss and the underwriting package. It seems in essence what you're saying is that the internal calculations, things that Munich is looking at, that you should have those, too, as part of the utmost duty of good faith. But isn't that really an expansion of the concept of having the same information as to the original risk of loss? The difference, Your Honor, is in primary insurance where you have an application and you have the ability to go and do due diligence, you know, you would go and look and you would ask. In the reinsurance context, between us and Munich, they are sort of in the position of the primary insurer. They had to tell us what they found because the industry does not go out as a reinsurer and do due diligence and do audits and do the types of things that you would expect a primary insurance company to do. They had to tell you that they found what? Excuse me, Your Honor? You said that they had to tell you what they found. Right. And in fact, they were... What they found, what? Well, they found that one of the MGUs, that there were stair-stepping reserves, which basically understates the reserves. They found that there were, Mr. Pawlowski testified that the numbers... But a process stair-stepping is not totally frowned on in the industry. Well, I believe, Your Honor, that there was some testimony saying that, from their experts saying that it's not, and then there was conflicting information saying that stair-stepping obviously leads to under-reserves. I suppose it's a matter of perspective, Your Honor. And didn't Ms. Hoekstra also say that since it was back in 1998 that that wouldn't even have been relevant for 2000? Well, what you want to know is what is your analysis of the risk that you're underlying? In this case, Munich raised their rate 150 percent. That was obviously some reflection that they thought there was a greater risk in this case. They also told them, to avoid telling us what the rate was, when they decided they were going to look at going offshore to this offshore insurer, they told us that they were doing it for tax reasons, when in fact the reason was because they couldn't book domestically a loss of a program where it was 150 percent expected loss ratio. Now, your underwriter was IOA. Yes, Your Honor. IOA asked for certain information from Munich and didn't get it. Correct, Your Honor. But yet they went ahead and wrote the business for you. They did, Your Honor. Even though they didn't get the information. So obviously, can't we conclude from that that IOA determined that the material it was asked for wasn't material, or they wouldn't have written it? I would submit not, Your Honor, for the reason that if you ask and don't get certain information, who bears the risk that that information turns out to be negative or wrong? It should be the person that had a duty to speak. The fact, I understand the argument saying, well, if you didn't ask again or you didn't insist, then how important was it? But if they had a duty to tell us what the information was, which I believe the cases are pretty clear that they had a duty to speak, then who bears the risk after the fact when it turns out that this program is a major loss? Okay. When she was being confronted while she was on the witness stand, by she I mean Ms. Huckstrap. Yes. And confronted with various information that it was claimed she did not receive, and then she was asked, would that have made a difference in your decision? Her response in almost every instance was that it might have. In other words, maybe, perhaps. Right, Your Honor. Well, in the materiality, it says, how is it material? If Ms. Huckstrap responds, well, maybe it made a difference, maybe it didn't. Well, Your Honor, that's one of the points I'd like to say, that I believe that the cases in the case of union indemnity, let's see, it's the matter of liquidation of union indemnity, which is cited in our brief. That case, which was decided after Christiana, basically said material facts are those likely to influence the decision of underwriters. Judge Wilson held this to a standard that it would have to influence the underwriters. The U.S. Supreme Court in Sun Mutual stated the principle as, quote, if disclosed would probably have influence. So, I mean, now you're asking somebody to go back five, eight years and say, would that have made a difference? And she gave truthful testimony saying, I think it would have, or it was likely, or in some cases she said it did. But, I mean, that's what the standard, that's why one of the complaints of our standard, that we complain about the standard, I see my time is out. Mr. Metallica, let me ask you one question. Yes, Your Honor. You know, there's, at least I have some concern about, you know, what information wasn't provided. I understand your position, but we're in a position, our standard of review in reviewing the district court's application of the law to the facts is controlled by Anderson v. City of Bessemer. And it's a rather restrictive standard of review. You know, how do we come to a definite and firm conviction that a mistake has been made? Your Honor, because I believe that the standard applied was not appropriate. The standard of saying that we had to prove that it would have made a difference instead of likely to make a difference is a higher standard. And I believe the district court applied the wrong standard as to that aspect of the case. And you're talking about the first prong. The first prong. And the second prong, Your Honor, our complaint, if I may. The complaint is that she said we had to prove what Munich believed. And I believe the test is what an objective insurer would have believed. Because for us to say we know what Munich believed, we'd never be able to prove it. And, of course, Munich got up and said it was a different layer and we, of course, didn't think they wanted it. Where's your case? Where's your New York case for that first prong? The first prong of likely? Yeah. That is in two places, Your Honor. That is in the matter of liquidation and it's also in the U.S. Supreme Court case of Sun Mutual where it says probably. So neither of them say would. And we believe that that's a material difference in the standard that we were asked to apply. You're asking that we adopted different tests rather than materiality. You're asking that we adopt a total mix of information test? Is that? Well, that's an alternative theory, Your Honor. That's what the courts do. You're not pushing that in place of materiality? But the total mix of information test, Your Honor, is another way of looking at what is material. So there is an alternative way of looking at it that has been adopted by the courts in the securities context. To me, it sounds a bit more expansive than materiality. Materiality is a little bit more more things. But it's only the information that they knew about and we believe had a duty to tell. Okay. Thank you. Mr. Hummer? Good morning, Your Honors. Paul Hummer from Munich Re. Your Honors are obviously very familiar with the record and I will not repeat what's in our brief. I guess I'd like to start with the Court's permission by talking a little bit about materiality, which is where Mr. From our perspective and I think from the District Court's perspective, the controlling decision, the controlling law is the law in Christiana, which is the law of New York and these contracts have a choice of law, a New York choice of law provision. And here's the standard for materiality as stated in Christiana. It is that the Court says the issue here is whether if ATVs had been independently listed, Christiana would have acted differently. And that's the standard in New York. Would they have acted differently? Well, one of the allegations of American is that Munich failed to disclose that it was going to lose money on the deal. Yes, Your Honor. And certainly wouldn't that information be material to what American, whether they would want to increase premiums or whether they want to insure it all? I'm not sure whether you're asking whether Munich would lose money or whether  that it itself was going to lose money. No. Well, that was not actually its evaluation. It had already disclosed, if you'll recall the record, to IOA Reason Underwriter that it had lost money in the prior years of the program and that it was unhappy with the performance of the program. And the testimony at trial was that related to Munich Re's pricing, not to any concern about the underlying risk, which Munich Re thought was a good risk, but they couldn't get the pricing right. With respect to what they expected going forward for the period covered by the retrocession contracts that Anika wrote, Munich Re's expectation was that it would make money. Its expectation was that this would be a favorable, that it had improved the treaty terms by increasing its premium and that it would make money going forward. Could you respond to one more thing? Mr. Mitalika's comment that you failed to disclose that you were going to move or move your operations offshore? The record on that is on a couple of different things. Number one, that it's common for this kind of business to be written offshore. Mr. Waterman, which is Aniko's expert, conceded and agreed with that. And the reason it's written offshore is that there are favorable tax accounting and reserving requirements for an offshore reinsurer. Number two, Munich itself would retain the risk. It would be initially placed with the offshore reinsurer, but 100 percent retroceded to Munich Re. And that's the testimony of Mr. Verhagen. And that means that as an economic matter, Munich Re was not avoiding economic risk. It was simply availing itself of more favorable legal requirements and accounting requirements offshore. And number three, Ms. Hoekstra's testimony was she didn't care who the reinsurer was. What she cared about was whether the risk of loss on the Everest policies was for claims in excess of $500,000 would be affected. Nothing about the decision to write offshore said a thing about the loss or the risk of loss of policy, of claims on policies written by in excess of $500,000. What it related to was Munich Re's price. If it could not get a price increase from Everest, then it would write the business offshore so that it could use that mechanism to reduce its expected loss ratio. In reality, it did get a price increase from Everest and it didn't need to do that. But none of that affects the underlying and original risk. And the testimony from every witness, from Ms. Hoekstra, from Mr. Waterman was what drove Aneco's risk was the risk of losses on the underlying policies. And the court's finding was that information, the information that would enable IOA Re to evaluate that risk, and that's the only risk Aneco had, was appropriately shared with Aneco. And the risk of loss, though, isn't that reflected in the rates that Munich was calculating for itself or other strategic decisions like going offshore that it was considering to try to manage loss? Don't those actually relate to the original risk of loss? And without disclosing those, how is their full information available? They do not. They don't relate to Aneco's loss. Aneco's premium is a function of the premium charged by Everest, not the premium charged by Munich Re. But both are taking account of risk of, the original risk of loss. They are. And what Munich Re is pricing, as the court has pointed out, is its retained risk, which is 250, excess of 250. And Ms. Hoekstra and every other witness agreed that that risk was materially different than the risk 500, excess of 500. And the information that what Munich Re was charging as its premium was its evaluation of the risk it was retaining, 250, excess 250. If you look at the pricing for the layer that Aneco had, 500, excess 500, both Munich Re and Aneco priced that at the same level. Munich Re's price was 1.65 and Aneco's, Munich Re's price was 1.73 and Aneco's was 1.65. But those are, they both came to the same conclusion as to what Aneco's layer would cost. And they both looked at the underlying risk to arrive at that conclusion. And with respect to that, they both used modeling because there was not enough information about the actual risk in which to generate a rate. And so they said, given industry-wide information, all insurers, all workers comp of this type, where it's going to be written, et cetera, what would we expect to be the premium we need to cover the risk 500, excess of 500? And with their own unique model, proprietary models, and using the information that they each considered relevant, they came to the same price. But they're not totally distinct, right? I mean, those layers actually overlap. They don't overlap in the sense of the risk. Let me see if I can make that clear. Munich Re bears the risk at the end of the day for 250, excess of 250. And IOA Re bears the risk, where Aneco bears the risk, 500, excess of 500. Those risks all arise from a single claim. But what they're pricing is the likelihood that there will be a claim in Munich Re's part that exceeds 250, and in Aneco's part that exceeds 500. Because as the program is structured at the end of the day, there's no sharing of risks between layers. And Ms. Hoekstra's testimony on this was, the only way in which we share the risk is that the losses arise from the Everest policies. But Aneco's risk is exclusively those claims that exceed 500,000, and only that part of a claim that exceeds 500,000. And so there isn't sharing in the sense that you might otherwise think of it. And Mr. Waterman testified that Munich Re could have a loss ratio of 500% and would have absolutely no effect on American nationals. Mr. Hammer, there's not a lot of case law around. You cited Christiana, but it's a Federal, it's a Second Circuit case. There's not a lot of New York law on this subject, and New York law applies. But there is this concept of utmost good faith, which has to mean something. It's meant something in the industry for years.  It seems to me that there's a whole host of issues of information that Aneco did not receive that at least Munich thought had some materiality. Has the doctrine of utmost good faith changed over decades or centuries? Is it less of a friendly operation than it was in the early 1900s when these cases were decided? I can't speak to the early 1900s, Your Honor. I can speak to what I understand the law to be today, which is that what's articulated in Christiana, and it does have, the doctrine of utmost good faith does have meaning. It does put the obligation on the seeding company to disclose objectively material information, which it reasonably should believe the reinsurer would consider material. Do you think your duty, on the same point, do you think your duty is satisfied by taking your underwriting material, the same underwriting material that you prepared and turning for In the nature of this program, Your Honor, where every underwriter testified that what mattered was the risk of loss on the Everest policies, the information that was received from Everest about its policies, what it intended to write, what classes of business and where, that was the information that would be objectively material to a reinsurer. The other information that Anneko points to largely relates to Munich Re's internal evaluation of its own program and largely its problems with the pricing of that program. Yeah, but its own program, and Mr. Mitalka corrected me or reminded me, I mean, its own program was that in its relationship with Everest, it agreed to cover from $250,000 to $1,000,000. It did. Okay. So, vis-a-vis Everest, it was on the hook for $750,000 of exposure. It was. Okay. And now it's going on with the Continental and now is with Anneko, okay, trying to get someone to pick up the top $500,000, okay? Now, it seems to me that if utmost good faith means anything, there ought to be at least a slightly different relationship between Munich and Anneko than there is between Everest and Anneko. Well, actually, Everest owes the same duty to Munich Re that Munich Re owes to Anneko. So, the legal standard would be the same regardless of which party you're looking at. Yeah, but doesn't Munich assume something by being the entity up front that says, we'll take that $750,000 of risk. Yeah. We're probably going to get somebody to take the top part of it, but we'll take the $750,000 and here's what we're going to charge you. Yeah. So, what's the duty? It seems to me there's a different duty between Munich and Anneko that has to be considered. I think that within that duty comes the information that Munich itself was able to obtain through having written the business for a couple of years before. Well, IOA Re had also written the business for a couple of years before. But, I mean, they're all in the same position in terms of their longevity on the program and everything else. I think what I would say is that's why there was so much focus at trial on the nature of the risk that Anneko was assuming. Because I think there can be no disagreement that the standard is we have to give you information that's material to your risk. It's not we have to give you information that's material to something else but not to your risk. It's to your risk. And the point of the trial was to allow Judge Wolfson to evaluate the strength of Anneko's claim that the information that was not provided to Anneko was material to its risk. And, you know, in this case, following a lengthy discovery period, Anneko sought summary judgment on its rescission claim. And it's worthwhile to look at the Court's decision on that motion because the Court said essentially I have all these factual and credibility issues. There's conflicting evidence as to whether this really was material to Anneko's risk or not. We're going to have a trial on that. All right. It seems to me that the claims audit, if you separated these points out, the claims audit nondisclosure. The heiress claims audit? Yes. Yes. That if that at least has some applicability to Anneko's risk. It may. In the abstract. And here's what the testimony was on that. Number one, Lisa Hoekstra didn't ask for audits. She asked for underwriting loss history. And loss history is different than a claims audit. And what she got was an underwriting audit that reflected what the historical loss history had been on the heiress business. What Anneko says it should have gotten was also a claims audit, which Lisa Hoekstra did not ask for. But what Lisa Hoekstra did testify, and Judge Krauss alluded to this, is that to the extent that what was in the claims audit related to years that were not going to be part of the Anneko program, it did not affect her analysis. And I think that's what Judge Wilson was looking to. What about the side deal over Commodore? Again, Your Honor, the question is how is that relevant to Anneko's risk? Well, I think it certainly appears to be a potential conflict. I don't know why, Your Honor. Well, they were unhappy. They clearly were unhappy with what they were getting from Everest on the Commodore deal. And Everest sweetened the pot. On the Commodore deal. On the Commodore deal. Now, the question would come, since they sweetened the pot, did that impact the way Munich looked at this workers' comp package? And I guess, Your Honor, the point I would leave you with, and I'm going to be out of time so it's my last point, is that the reason Munich decided to reinsure Everest has nothing to do with the risk that Anneko assumed. It doesn't affect it. Whether they took it because of the Commodore program or they took it for something else, Anneko's risk from day one is only the risk of losses, 500, excess of 500, on an Everest claim. And as we pointed out in our brief, there is no reason, and IOA really never wanted to know, and evidenced by its own conduct that it didn't matter to it, why Munich really would reinsure Everest. There was some information that Ms. Hoekstra had requested that Munich never disclosed. She asked for the rate, Your Honor. That's the only thing that she asked for that wasn't disclosed. She didn't ask why Munich really wanted to reinsure. But you think that's a piece of information that American could consider in determining, making its decision as to whether to insure or what rate to charge? The rate, Your Honor? Yes. I mean, the testimony of trial was she asked for it. The record was unclear whether she got it. The district court concluded she didn't. But she clearly issued the quote. And I don't know whether she got it or didn't get it. I don't know why she didn't get it or if she didn't get it. But what I do know is that she issued the quote and her own testimony is she would not issue a quote unless she had all the material information. And I would point out that the standard in Christiana to justify rescission is that it's information of which the reinsurer has no reason to know it doesn't have. And clearly in circumstances where a reinsurer knows it doesn't have something, it cannot come back later and say, I may have quoted it, but now I'm entitled to rescind it. There was never a subsequent request from Ms. Hoekstra for that? Not that I'm aware of. The record certainly does not reflect that. I'd like to hear your response to the question of whether you are contending that a seating insurer's internal calculations are never going to be deemed material or required to be disclosed. I guess it depends on internal calculations of what. So there are two kinds of calculations that are at issue here. There are Munich Re's historical loss ratios, which reflect its experience and are driven largely by its pricing. And the testimony was that that loss ratio calculation, everyone expected, Ms. Hoekstra on down, that Munich Re's loss ratio would be different from the program as a whole, would be different from ANACO's, and would be reflective exclusively of the comparison of the claims in the 250XS250 layer to the premium charged for that. Was there a request for that information? There was not, Your Honor. There never was. Even when ANACO knew that Munich Re was losing money, there was never a request for a loss ratio. The other loss ratio that ANACO argues about is Munich Re's calculation of both its expected loss ratio prospectively, and also its calculation of the loss cost for the ANACO layer, which is the price that Munich Re would charge for that layer if it were paying for it itself. And those two calculations, again, certainly were never requested. Ms. Hoekstra's testimony was she assumed that Munich Re was making those kinds of calculations. Everyone would need to make those kinds of calculations, and she never asked for it. But they also don't inform ANACO's evaluation of the risk. With respect to Munich Re's own evaluation of its expected loss ratio, the testimony was they expected to make money, but they had an underwriting loss ratio of 110%, I think was the final number. And that loss ratio was reflective of Munich Re's retained risk, 250XS250, and said nothing about ANACO's. We have to finish up, Mr. Hummer. Okay. Thank you very much. Thank you very much. Mr. Mitoka? I'd like to address a couple of issues that Mr. Hummer raised. One, as to Commodore, the testimony at trial, Appendix Volume 9, page 121, an email they received from the executives at Everest, quote, contingent upon the completion of this treaty, Everest will make a good faith gesture to American Re, in the amount between $250,000 and $300,000. American National or Iowa Re never knew anything about this underlying deal that they had to get it done so they could get payback on another program. And we think that's, if the duty of utmost good faith means something, it's got to mean that you're going to tell people what your motivations are. Volume 12, Appendix Tab 82, an email from Mr. Polowski, where he tells the executives at American Re, we think, he gives the rates and he gives expected loss ratios of what the antico layer would be. And he knows they're going to lose money. But he doesn't tell anybody. And in fact, your honors, I'd like to go back. This whole case on rescission started in the middle of this case when Mr. Polowski testified that his belief that the numbers they got from Everest Re were dubious. That's what started this thing. We then moved for leave to file this rescission case and it was granted. Because, you know, their belief was the numbers they were getting, the underlying information was dubious. Can we go back to Commodore for a second? Yes, your honor. Wasn't there testimony that the payback was not related to Munich's decision to continue reinsuring the workers' comp program? That's what the defendant said. So how is it clear error for the district court to credit that testimony? Well, your honor, it was clearly related to this program and they didn't disclose it. Now, whether they ultimately decided to do this for other reasons, that's what they testified to. And I'm not sure how a plaintiff would go about saying, well, you're wrong. Clearly, Everest thought it was related because they made a contingent upon this contract taking place. Now, your honors, one other thing I'd like to address is the key difference between the position of Munich and American National is Munich had the right to do reviews and audits and then they didn't turn over that information. American National expected utmost good faith and it has to mean something. And they did these audits and reviews and didn't turn over the information except for one that turned out to be favorable but held the ones that you could argue were not favorable. Is that standard in the insurance industry that you turn over this type of material? The standard by both experts, your honor, was that if it was material information, either you turned over the audit report or you gave people a summary of what it said. In this case, they gave over the one that was favorable and didn't give anything on the others. And they wanted to get into wordsmithing as to did she ask for an audit or was it a review and then they tried to characterize it as something she didn't ask for. Do you agree it was appropriate for the district court to consider the industry standard as to whether those types of materials would automatically be turned over if they weren't specifically requested? Not in the reinsurance setting. I believe in a primary setting, yes, your honor. But in a reinsurance setting, we believe the law to date has been that you have to turn over everything that's material whether it's asked for or not. And so what the industry practice of what's automatically turned over, it depends on whether you're looking at a primary policy, a marine insurance policy, or a reinsurance policy. But that materiality depends on what the person possessing the information has without any reference to what the reinsurer deems to be material. Which is why we believe it has to be an objective standard and we shouldn't be held to prove what Munich believed that we would want. Because the defendant is always going to get up and say well we didn't think they'd want that. And the part about different layers and the different risks, we don't get on the hook unless they blow through Munich's layer. So everyone's looking at how many claims are going to arise, big enough claims are going to get to your layer. Unless we know how many Munich things are going to blow through their layer, then how are we ever going to decide whether, fairly, whether we're going to get to our layer or not. And so this whole idea of well there are different risks, sure in a theoretical basis, we don't attach to 500,000, but that means it's blown through Munich's layer already. So look, Judge Wolfson on page 85 and 86 of her opinion has a laundry list of things that they withheld from us. If you look at the totality of it, and I understand that that's a securities test, but materiality should be materiality. If you look at the totality of all of these things that were not given to Iowa Area or American National, we don't know how the court could have not found that there was a violation of the utmost duty of good faith. And part of it is in today's modern economy, people think that they're sophisticated parties, they should be able to do due diligence and do it. But that's not what this business has been to date. And so what we're asking this court to do is to set the standard or tell people that the duty of utmost good faith now means you have to go and ask more questions instead of expecting to get it automatically. My time is up unless the court has other questions. I have a couple that I hope you'll see. Yes, Your Honor. One is, you mentioned in your reply brief seven new claims with retro amounts. Are you referring there to losses that existed but weren't disclosed? Yes, Your Honor. And is that before Aneco agreed to provide retrocessional coverage? That's what the record reflects, Your Honor. Secondly, on the known loss doctrine, page 47 of your brief, you referenced that. Are you raising that as a separate basis for rescission or as a way that the duty of utmost good faith was breached? Your Honor, well, Your Honor, I'm sorry. The known loss doctrine technically in New York applies to losses that are known to exist. We argue it by analogy because these were losses that they expected us to incur, but I can't say they existed at the time that we signed the document. But their reviews, their analysis, said Aneco is going to lose money on this loan and we're going to lower the rate to Aneco while we raise our own rate. And so I can't say that it's a separate, alternative basis, Your Honor, because technically the losses, at best that we can tell from the record, did not all exist as what they expected. So whether technically the known loss doctrine applied or not is subject to debate. Thank you, Mr. Mitoka. Thank you, Your Honor. And Mr. Hummer, thank you as well. Both counsel, very helpful arguments. We'll take the case under advisement.